SKIP KIRCHDORFER, INC.

v.

The UNITED STATES.

No. 337–89C.

United States Claims Court.

Aug. 18, 1992.

Laurence J. Zielke, Louisville, Ky., attorney of record, for plaintiff. William H. Mooney and Pedley, Ross, Zielke and Gardinier, of counsel.

Mark D. Rubino, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, attorney of record, for defendant. Stephanie Cates–Harman, Dept. of the Navy, of counsel.

## OPINION

HARKINS, Senior Judge:

Skip Kirchdorfer, Inc. (plaintiff or SKI) was a subcontractor in a contract awarded by the Naval Facilities Engineering Command, Atlantic Division (NAVFAC) to a joint venture for the design and construction of family housing units at the Guantanamo Bay, Cuba, Naval Station. The joint venture (JV) consisted of American Export Group, International Services, Inc. (AEGIS) and Zublin Delaware, Inc. (Zublin). Plaintiff contends the Navy seized its warehouse, which resulted in a taking of plaintiff's personal property. In its complaint, plaintiff claimed $5.5 million; ultimately the claim was reduced to $951,821. The case is before the court after trial of the taking issue.

The prime contract, entered November 25, 1985, was a negotiated firm fixed price construction contract in the amount of $11,595,000. It was a "turnkey" contract for construction of 125 units of family housing. The subcontract, dated June 17, 1986, covered the construction portion of the work at a fixed price of $4,250,000. It provided that the JV would supply all construction materials, and SKI would furnish all necessary tools, equipment and labor.

The prime contract provided work was to start on November 30, 1985. The JV was to complete work on plans and specifications by January 29, 1986, and all work on the project was to be completed by July 23, 1987. As a result of delays, beneficial occupancy of various housing units was not given until the period January 15, 1988—August 21, 1988. Final completion of warranty and punch list work was in August 1989.

The prime contract was on standard forms that included general provisions applicable to construction contracts. Standard Form 23–A March 1981 (Rev. 8/83).

The subcontract was on forms developed by the Associated General Contractors of America. AGC Document No. 600—August 1984. The subcontract identified special provisions and contract documents applicable to subcontract work, and relevant provisions of the prime contract were incorporated by reference with modifications and specifications set forth in attachments. The subcontract provided special procedures for its termination by the parties. The parties agreed all claims, disputes and matters in question related to the subcontract or to its breach would be decided by arbitration.

General Provision No. 38 was included in both the JV prime contract and in the SKI subcontract. This provision authorizes the contractor to erect temporary buildings for storage, shops and offices, only with the approval of the contracting officer, from materials purchased by the contractor without expense to the government. Such temporary buildings remain the property of the contractor and are to be removed at contractors' expense on completion of the work. In addition to General Provision No. 38, the subcontract's scope of work article obligated SKI to provide storage and protection of construction materials provided by the JV, and an office and accommodation for the JV's representative.

In negotiations for the Project, in order to accommodate the construction of residences at both leeward·and main base at Guantanamo Bay, the JV proposed two locations for its temporary office space and warehouse/shop operations. The initial proposal had on the main base: a 1,000 sq. ft. office, and a 10,000 sq. ft. warehouse/shop; and on leeward: a 500 sq. ft. office, and a 5,000 sq. ft. warehouse/shop. These items totaled $117,500 on the schedule of prices. The contract subsequently was changed to locate all residences on the main base. This resulted in a need for only one location for office and warehouse/shop facilities.

On June 10, 1986, SKI purchased in the United States materials to be shipped to Cuba for a 120 ft. × 300 ft. building. The temporary building would have a galva-

nized metal roof and ribbed steel siding, and would provide a 36,000 sq. ft. area. The total cost of the materials was $63,105.

On June 27, 1986, SKI requested the Navy to approve the location for its warehouse and storage area on Sherman Avenue. The Navy gave its approval, subject to requirements of the family housing project contract, on September 16, 1986. SKI purchased and shipped to Guantanamo all materials used to construct the Sherman Avenue warehouse facility. SKI performed all construction related to construction of the building and improvements. As constructed, the 36,000 sq. ft. temporary structure included 1,000 sq. ft. for office space.

At the time SKI built the Sherman Avenue warehouse facility, it had other prime and subcontracts for work at the Guantanamo Bay Naval Base. Materials, tools, and equipment relative to SKI's other contracts were stored in the Sherman Avenue warehouse and compound. Construction materials owned by the JV that had been furnished for the Project also were stored in the warehouse facility. Although these various types of property were segregated roughly by warehouse areas, SKI did not maintain inventories of any of the items in the warehouse facility.

On August 12, 1987, SKI submitted to the JV a schedule of mobilization prices that included 1,000 sq. ft. of office space, priced at $15,000, and 15,000 sq. ft. for a warehouse/shop, priced at $135,000. Progress payments for mobilization, paid by the Navy to the JV, and from the JV to SKI, included $150,000 for the office and warehouse/shop facility.

During the period 1986–88 the Project was delayed, and substantial changes occurred in the relationships of the parties. In 1987, Zublin took over completion of the housing project after AEGIS on April 30, 1987, filed a petition under Chapter 11 of the Bankruptcy Code. Disputes between SKI and Zublin, acting for the JV, culminated on November 5, 1987, in arbitration proceedings pursuant to the subcontract. These arbitration proceedings are pending.

As of August 30, 1988, most of the Project construction work had been completed, and occupancy by Navy personnel of the residential units was in progress. As of that date, a substantial amount of work remained outstanding. Numerous punch list items needed completion, and workmanship deficiencies directly attributable to SKI's performance, and for which SKI was responsible, were substantial. Workmanship deficiencies included: improper welding, improper plumbing connections, failure to connect bathtub overflow drains, defective duct work, use of defective materials, and use of rejected materials.

After August 30, 1988, JV personnel did not man an office in the warehouse. Representatives of the JV remained in contact with the Navy through trips to the Base and by telephone. The JV maintained a presence in Guantanamo Bay throughout the course of the Project.

In September 1988, because of its dispute with the JV over nonpayment, SKI refused to perform any more work on the Project. SKI asserted control over the warehouse, and rented some of the office space to the Kelley Company. SKI performed no further work on the Project after September 15, 1988. Prior to SKI's repudiation of the subcontract, the JV had office space in the warehouse and had free and continuous access to the warehouse.

On September 29, 1988, the Navy notified the JV that lack of performance on the punch list items and warranty work was not acceptable and that termination for default was being considered. The notice was given to JV's bonding company, with intervention requested.

As of September 30, 1988, the JV had paid SKI $4,073,058 for subcontract work. The balance owed was $16,963. As of September 30, 1988, SKI had submitted to the JV claims for delays, nonpayment, and extended overhead, that totaled $940,000.

In October 1988, both the JV and SKI invoked the termination provisions of the subcontract. The JV claimed it could terminate because SKI had failed to correct improper and defective work. SKI claimed

it could terminate because of JV's failure to make progress payments. The record is not clear as to which party acted first. It is clear, however, that, prior to December 1988, the subcontract had been terminated by mutual agreement.

As a result of the Navy demand, the JV sought access to its construction materials stored in the warehouse facility. Throughout October and November, 1988, SKI continued to deny the JV access to materials needed to complete construction of Project units. In November 1988, the JV made interim arrangements with another contractor, APTCO, to perform some of the warranty and punch list work.

In November 1988, during negotiations on SKI's claims that were in arbitration, SKI asked the JV to provide a list of materials in and around the warehouse that were maintained for the JV. SKI suggested that "perhaps some accommodation can be made" and stated SKI could be entitled to the materials as a setoff for the JV's alleged lack of payment. The JV took the position that only materials supplied by the JV for the Project should be in the warehouse, and, if SKI had other materials and equipment stored in the warehouse, it was SKI's responsibility to segregate such materials and equipment. The JV would not provide to SKI a list of materials necessary to complete the remaining punch list items and warranty work for the Project. The JV noted that it had terminated the subcontract and, under Article 10.1.2 had the right to use any materials, equipment and tools furnished or belonging to SKI to complete the project work. There is no inventory in the record of the materials, tools, and equipment that were located in the warehouse and compound on or before December 8, 1988.

In early December 1988, Zublin's president met with SKI's representatives on Guantanamo in an attempt to gain access to the warehouse and to Project materials. At the warehouse, SKI's project manager said that Skip Kirchdorfer, SKI's president, had instructed that no one was to be allowed access to the warehouse.

On December 8, 1988, Zublin's president, acting on behalf of the JV, met with the Navy's Resident Office in Charge of Construction (ROICC) to seek aid in obtaining access to Project construction materials in the warehouse. At that time the Navy agreed to work with the JV in an effort to assure completion of the punch list and warranty work.

On December 9, 1988, Zublin's president filed a complaint with the Base police concerning the refusal of SKI to deny access to the warehouse facility and stored Project materials. As a result of this complaint, on December 9, 1988, the Base commander issued to SKI a notice with the following subject: ORDER TO CEASE AND DESIST DISTRAINT OF PROPERTY OF AEGIS/ZUBLIN JOINT VENTURE. Paragraph 1 of the order recites that SKI was currently distraining certain goods and materials owned by the JV, and that SKI had denied access to and removal of that property. Paragraph 2 of the order recites that the Commander had been advised that there is a dispute between SKI and the JV concerning what property belongs to them, and that its local manifestations were "detrimental to the mission of this military installation."

Paragraph 3 of the order stated:

3. Accordingly, I order your representatives at Guantanamo Bay, Cuba, to:

a. Allow representatives of AEGIS/Zublin Joint Venture free, continuous, and unhampered access to their materials and property;

b. Allow AEGIS/Zublin Joint Venture to identify, segregate, and remove their property, provided that they sign an itemized receipt for any property so removed. If you contest or dispute ownership of any of the items, your representatives should note the dispute on the receipt, and the issue can be settled, if necessary, by normal legal process in the United States.

SKI's project manager on December 9, 1988, by telephone, notified Skip Kirchdorfer of the conversation with the ROICC. As a result of this communication, Skip Kirchdorfer mailed a certified letter dated

December 9, 1988, to the ROICC. SKI's letter asserted that the warehouse, office, storage area and materials were the property of SKI, had been paid for by SKI, and were being used for all of SKI's projects at Guantanamo Bay. The letter included the following paragraphs:

Your threats are not taken kindly and, if carried out, would amount to a material breach of all Skip Kirchdorfer, Inc's contracts at Guantanamo Bay, Cuba. This would leave us no alternative but to leave the island and hold the Navy responsible for all Skip Kirchdorfer, Inc.'s assets located there.

Your acting with Zublin, as you have threatened, constitutes taking Skip Kirchdorfer, Inc.'s property without due process. This is in violation of the rights provided under the 5th amendment of the constitution of the United States.

The letter concluded that under no circumstances would Zublin be allowed in the warehouse or granted the use of office space.

On December 12, 1988, SKI's project manager was restrained by Base Security, frisked, read his rights and required to sign a Navy form captioned: CIVILIAN SUSPECT'S ACKNOWLEDGMENT AND WAIVER OF RIGHTS. The form recites that the SKI project manager had been advised by the Command investigator that he was suspected of "failure to obey an order given by the Commanding Officer." The waiver was signed on December 12, 1988, at 2:44 p.m.

On December 13, 1988, Navy Security personnel and others, including representatives of the JV, at approximately 8:15 a.m., arrived at the warehouse. Entry was gained by Navy personnel forcing the warehouse door. The warehouse and the compound were secured by locks to which only SKI's project manager had a key. After entry, the Navy Security personnel cut the locks. During the entry, Navy personnel, JV personnel, APTCO personnel, and Kelley Co. personnel, were given access to the warehouse.

On December 14, 1988, the Navy JAG notified SKI that the entry of the warehouse was taken to mitigate the local impact of the contract dispute between the JV and SKI. This letter emphasized that the local manifestations of the dispute between SKI and the JV adversely impacted the mission and good order of an overseas military installation, and that completion of the work would not "be held hostage to this dispute." The letter denied that the Navy had "seized" the warehouse or any of its contents, or that SKI had surrendered it or its contents to the Naval Base. In this regard the letter stated:

To the contrary, Skip Kirchdorfer, Inc., still has, and shall continue to have, free, unhampered, unrestricted, and continuous access to the warehouse and all Skip Kirchdorfer, Inc. property therein. This point has been clearly communicated to both Mr. Grant and to the representatives of the Joint Venture.

After entry on December 13, 1988, the JV hired a representative from APTCO to be present at the warehouse during normal working hours, to maintain a sign-out book, and to monitor removal of materials from the warehouse. Under the procedures, whenever the JV removed materials, its representative was required to sign an itemized receipt. SKI was given the opportunity to be present whenever materials were to be removed. The Base police monitored withdrawal of materials, equipment and tools by the JV, and collected the sign-out sheets. SKI did not participate in the sign-out procedure.

On December 19, 1988, SKI filed a claim for $5 million in the District Court for the Eastern District of Virginia, alleging a wrongful taking without due process of law, conversion, false imprisonment, and tortious interference with contract rights. By order dated March 31, 1989, the district court dismissed the tort claims, found the Claims Court had exclusive jurisdiction of claims not sounding in tort in excess of $10,000 and ordered the action to be transferred. The taking claims were transferred to this court on June 15, 1989.

Beginning January 7, 1989, approximately 30–35 workers, acting on behalf of SKI, with three or four large semi-trucks, re-

moved substantial amounts of materials, tools, and equipment from the warehouse and surrounding yard. This particular removal effort spanned a 1–week period in January 1989. SKI's project manager directed the action of the workers.

During January and February 1989, SKI representatives entered the warehouse on numerous occasions and removed various equipment, tools and materials. SKI removed large pieces of equipment located in and around the warehouse. SKI loaded a large number of items onto a barge over a period of 2–3 days in the spring of 1989. The loading was directed by SKI's project manager.

SKI's removals from the warehouse continued into March 1989. The only SKI material, tools and equipment that remained in the warehouse, after SKI's removal efforts, were either damaged, inoperable, or worthless.

During the period January–March 1989, the Navy did not receive any complaints from SKI representatives that they were being denied access to the warehouse or its contents. No inventory of items removed by workers for SKI was completed at the time the items were removed. There is no inventory in the record of items loaded on the barge in the spring of 1989.

During the period May 11, 1989, to July 26, 1989, SKI personnel submitted voluntary statements to Base police and requested an investigation concerning materials, tools and equipment that SKI alleged to be missing from the warehouse. SKI estimated that approximately 80 percent of the tools and materials were missing. The lists submitted were based on recollection, and were not supported by inventories or other records. Base Security police conducted a limited investigation on the basis of these complaints. SKI did not provide Base Security with an official inventory or other adequate documentation, however, and the investigation was not completed.

In August 1989, the ROICC instructed the JV to dismantle the warehouse and restore the storage area to its original condition as part of Project demobilization. On August 16, 1989, the JV notified SKI that this responsibility under the subcontract was SKI's as owner of the warehouse and yard. On August 28, 1989, the JV notified SKI that as a result of SKI's failure to act, the JV would take such action as appropriate to dismantle and dispose of the warehouse. SKI refused to declare its intentions to the JV, refused to dismantle and dispose of the warehouse, and never requested the ROICC that it be allowed to continue use of the warehouse at the Sherman Avenue or any other location.

On September 27, 1989, Zublin signed a contract with Virginia Wrecking Company for that company to remove the warehouse and restore the site to the satisfaction of the ROICC in exchange for use of excess materials and the warehouse structure. The Navy approved the JV's sale of the warehouse and that company was allowed to use the warehouse until August 1991. Virginia Wrecking Company dismantled the warehouse, and, in the absence of a demand for scrap, took the parts to the dump.

## DISPOSITION

This case involves a dispute between a prime contractor and a subcontractor, who was not in privity with the government, in which negotiating tactics in the dispute escalated to the extent that government contracting officials became involved directly. The issue is whether the Navy's action on December 13, 1988, and subsequently, constitutes a taking of personal property for public use.

█ The Fifth Amendment provides: "nor shall private property be taken for public use without just compensation." The just compensation clause was designed to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Whether a particular act by the government amounts to a taking ultimately depends in large part on the particular circumstances of the case. *United States v. Central*

*Eureka Mining Co.*, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958). The "takings" clause applies to property of United States citizens located outside United States boundaries. *Seery v. United States*, 127 F.Supp. 601, 130 Ct.Cl. 481 (1955); *Juda v. United States*, 6 Cl.Ct. 441, 458 (1984). It is not essential for the government to have taken property for its own use for a taking to be found. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). A taking can occur simply when the government by its actions deprives the owner of all or most of his interest in his property. There can be a taking if the government makes it possible for someone else to obtain the use or benefit of another person's property. *Aris Gloves, Inc. v. United States*, 420 F.2d 1386, 1391, 190 Ct.Cl. 367 (1970).

▪ The United States may be held responsible for a taking even when its action is not the final direct cause of the property loss or damage. The test is whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment. *Langenegger v. United States*, 756 F.2d 1565, 1570 (Fed. Cir.), *cert. denied*, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985).

▪ Substantial interference with the owner's use of the property is sufficient, but not every deprivation of use, possession, and control is a "taking." *Finks v. United States*, 395 F.2d 999, 1003, 184 Ct. Cl. 480 *cert. denied*, 393 U.S. 960, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968). A taking may be by physical occupation of the property or by overly intrusive application of regulations that go "too far." *See Hendler v. United States*, 952 F.2d 1364, 1375 (Fed. Cir.1991).

In this case, SKI alleges a taking by physical occupation of personal property by forcible entry and by transfer by the Navy of possession and control to the JV. The status of the JV's prime contract, and the status of SKI's subcontract, defines the context of the Navy's actions on December 13, 1988. The contractual nexus is essential to a determination of whether there was a taking of SKI's property for which compensation is owed.

When Zublin's president met with the ROICC on December 8, 1988, to seek aid in obtaining access to its construction materials in SKI's warehouse, the Project was in its final stages. Basic construction had been completed, and beneficial occupancy dates for units in the various sites had been determined for purposes of computation of liquidated damages. Some units were occupied by Navy personnel.

SKI's labor force, which at one time numbered 250–300 workers, had been reduced to 15–20. The dispute between the JV and SKI had culminated in the termination of SKI's subcontract. SKI had stopped all work on the Project, and SKI denied responsibility for any warranty or punch list work.

The ROICC had threatened the JV with a default termination of the prime contract if the warranty and the punch list work was not completed expeditiously. The ROICC was confronted with numerous complaints from personnel in the housing units about construction deficiencies. Materials needed for the remaining Project work, owned by the JV, was stored in SKI's warehouse. Both the JV and the ROICC recognized time constraints would be involved in location of an alternative source, and for transportation to Guantanamo of newly procured construction materials.

There are three categories of property involved in SKI's claim: (1) materials that were procured by the JV and furnished to SKI for storage and use in the Project; (2) the temporary warehouse structure, consisting of materials that were purchased by SKI, shipped to Guantanamo by SKI, and used by SKI in its construction of the building, as well as permission to use the structure; and (3) SKI's tools and equipment used for work on the Project, as well as SKI's materials, tools and equipment applicable to SKI's other, unrelated, work on the Naval Base. These categories will be considered separately.

*Category 1*

Construction materials supplied by the JV were the property of the JV at all times. SKI's subcontract in its scope of work attachments made the JV responsible to provide all construction materials, which were to be delivered CIF to Guantanamo Bay. SKI was responsible to furnish all necessary tools, equipment and labor necessary for construction of the units, and for associated expenses for transportation, shipping and housing of such labor, tools and equipment. SKI was obligated to unload from barges construction materials supplied by the JV, to transport the construction materials to the stockyard and to construction sites, and to store and protect the construction materials during the whole period of construction.

SKI's subcontract contained two provisions relative to progress payments: Article 5.2 and General Provision 7(d). Both provisions, when progress payments were made for stored construction materials, protected the prime contractor's and the government's property interests. Subcontract Article 5.2.4 authorized progress payments for materials not incorporated in the subcontractor's work, but delivered and suitably stored at the site or some other authorized location. Progress payments for stored materials were authorized only when the payment procedures would establish the Owner's [the Navy] and the Contractor's [JV] "title to such materials and equipment or otherwise to protect the Owner's and Contractor's interest therein, including transportation to the site." General Provision 7(d) in relevant part provides: "All material and work covered by progress payments made shall thereupon become the sole property of the Government...." The Navy made progress payments to the JV that were paid to SKI which included payment for the construction materials that were stored in SKI's warehouse. The property interest acquired by the Government pursuant to General Provision 7(d) is a security interest in the materials to secure funds loaned to the contractor through progress payments. *Marine Midland Bank v. United States,* 687 F.2d 395, 399, 231 Ct.Cl. 496 (1982),

*cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983). The government's lien on construction materials that were located in the warehouse on December 13, 1988, was superior to any interest SKI had in such category 1 materials.

SKI asserts it had an equitable common law possessory lien on the construction materials supplied by the JV. SKI contends its property interest in the construction materials falls squarely within the parameters of the ruling in *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). In that case, the Supreme Court found that the destruction by the government of materialmen's liens was a taking. The property interest in *Armstrong* is not apposite to SKI's interest in the construction materials. In *Armstrong,* valid liens were in existence under Maine law, and the plaintiff had an established enforceable property interest before the government acted to transfer the hulls and materials to which the liens attached. SKI has no comparable property interest.

■ SKI's contention that it has a lien is based in part on Subcontract Article 5.1.5, which conditions payment to SKI on SKI's providing waivers on partial liens or claims for completed work. Such condition was to protect the JV, and it applies only when such waivers are required by the JV. This paragraph does not recognize a lien right in SKI, and, contrary to SKI's contention does not provide that SKI retains all lien rights "unless and until the Joint Venture obtains a Statement of Waiver from SKI concerning such liens." SKI's construction of this paragraph is a gross misinterpretation of its language. The paragraph does not give rights to SKI; it protects the JV from double liability from SKI.

■ SKI had neither a common law possessory lien nor an equitable lien relative to the construction materials. SKI had possession of the JV's construction materials pursuant to the subcontract obligation to store and transport such materials. SKI's asserted right to retain possession was based on an inchoate claim against the JV,

which was still to be determined in arbitration proceedings.

■ An equitable lien is asserted by a creditor against property in the possession of a debtor. Here, SKI, claiming to be a creditor, had possession. Further, there was no final debt or obligation owed to SKI. SKI had only its claim, then in arbitration. The elements of an equitable lien are: (1) a particular obligation owed by one party to another, (2) an identifiable res to which that obligation fastens, and (3) an intent that property serve as security for the payment of the obligation. *See R.M. Shoemaker Co. v. Southeastern Pennsylvania Economic Development Corp.*, 275 Pa.Super. 594, 419 A.2d 60, 63 (1980). Before a court will impose an equitable lien, it typically will require a showing that "the law fails to give relief and justice will suffer without the equitable remedy." *See, e.g., Jorritsma v. Tymac Controls Corp.*, 864 F.2d 597, 599 (8th Cir.1988).

By October 1988, SKI had claimed it was owed $940,000 by the JV. The specific property claimed to be subject to an equitable lien was not known. SKI did not keep an inventory and had no idea what was contained in the warehouse. An identifiable res was missing.

■ SKI did not have a common law lien on the JV's construction materials. The elements required to establish a common law lien are: (1) property is bailed to the creditor/bailee, (2) the creditor/bailee expends skill or labor to improve the property with (3) the implied or express consent of the owner of the property, and (4) the debtor/bailor fails to pay the creditor/bailee for the improvements to the property. *See Kalio Universal, Inc. v. B.A.M., Inc.*, 95 N.J.Super. 393, 231 A.2d 376 (1967). SKI never performed improvements on the JV's construction materials that were in the warehouse. Consequently, SKI could not have had a common law lien on those materials.

■ SKI's claim that it was entitled to some amount of delay damages from the JV is not sufficiently specific to vest SKI with a common law lien. For a lien to be valid, the amount of the lien must be clearly established and not open to change in subsequent proceedings. *See United States v. New Britain*, 347 U.S. 81, 86, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954); *United States v. Pioneer American Ins. Co.*, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963).

The subcontract precludes SKI from claiming a lien interest in the JV's property. In Article 14.1, the parties agreed to arbitrate "[a]ll claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof...." Article 6.4 provides that SKI's "sole and exclusive remedy for delay shall be an extension in the time for performance of [SKI's] work." These contract provisions outline SKI's exclusive remedies. They are designed to ensure that SKI complies with Article 3.1, which states that "time is of the essence." Consequently, SKI did not possess a valid lien interest.

■ The government's property interest, as represented by its lien derived from the progress payments, was an adequate foundation for the Base Commander to implement his responsibilities as the official in charge of a remote military installation located in a foreign country by an authorization to security personnel to enter the warehouse and make the construction materials available for use by the JV. The Base Commander was exercising his authority for administration of the base; the purpose of the entry was not to resolve finally the dispute between the JV and SKI. SKI's rights as a subcontractor did not entitle it to prevent access to the JV's construction materials by holding that property hostage as part of the on-going dispute.

■ There are no provisions for recording or perfecting liens on Guantanamo Bay, Cuba. It is not possible for a lien to attach to government property. *Armstrong v. United States*, 364 U.S. at 43, 80 S.Ct. at 1566. The rights of the contractors on the base are protected, either in the contract through arbitration or some other right, or by the Miller Act. 40 U.S.C. § 270a (1988). The Miller Act requires the

contractor to post a payment bond to protect the rights of suppliers of materials or services. The Supreme Court has stated that the purpose of the Miller Act is to substitute a surety for the mechanic's lien available to protect subcontractors in non-government construction projects. *F.D. Rich Co. v. United States,* 417 U.S. 116, 121–22, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1973). Thus, because of the government's interest in the JV's property through the progress payments clause, SKI could have proceeded under the Miller Act, or in arbitration, rather than by locking the JV and the Navy out of the warehouse. In other proceedings, SKI has filed a claim under the Miller Act, in the United States District Court for the Eastern District of Virginia, seeking, among other things, damages due to the same alleged delay.

*Category 2*

■ The warehouse was personal property, not realty. It was a temporary structure with a dirt floor erected by permission on land leased to the Navy. The subcontract with the JV was the sole source of SKI's right to construct a storage area. Its location on Sherman Avenue, and any right to continue to occupy and use the warehouse was subject to approval by the Navy and on the need for storage areas for the Project under both the prime contract and the subcontract.

SKI was contractually obligated to transport and store the construction materials supplied by the JV. General Provision No. 38 permits the erection of a temporary storage building for the convenience of prime contractors and subcontractors. SKI decided whether a building was necessary, where to request permission for its location, and whether it would contain office space for the JV. The type of building, the location and the extent of the permission to use it were all subject to Navy approval and the Navy's approval was limited to the requirements of the prime contract for the Project.

SKI contends that custom and local practice created a situation in which the Navy gave SKI an easement to use the ware-

house and compound at its location on Sherman Avenue for storage purposes until such time as SKI no longer had ongoing contracts at Guantanamo or the Navy had a need for the use of the land. SKI, in addition, contends that the grant of the easement was not terminable at will "since it was for a period of time which was extended every time the Navy entered into another contract with SKI or SKI entered into a subcontract with a contractor doing business with the Navy." It is clear that SKI had a property interest in the components of the temporary structure. Also, SKI controlled access to the building and compound, decided on hours of operation, could sell or relocate the building, or even dismantle and ship it away from Guantanamo. Further, as long as SKI had ongoing contracts, under the local practice, it could continue to use the warehouse, subject to approval by the Navy, after completion of the contract for which approval was given initially.

■ It is equally clear, however, that custom and local practice did not create any easement that is recognized in the law of real property. At all times, SKI's property interest in the warehouse was based on relevant contract provisions and was subject to Navy approvals under those provisions.

The practice on Guantanamo Bay was to permit a contractor to use a warehouse for projects other than those specifically identified by the contract on the approval form. In this case, the Navy had been informed by SKI that SKI stored materials for all of its construction projects, as well as the housing project, in the Sherman Avenue warehouse. It was also a matter of custom and policy to permit a contractor with ongoing contracts to extend the usage of a warehouse beyond the duration of the contract under which the warehouse was approved. According to the terms of General Provision No. 38, however, the temporary warehouse was required to be removed and the site returned to its original condition after the Project was completed.

SKI never sought, and was never granted, permission to keep its warehouse stand-

ing after the housing contract was completed. SKI rebuffed all opportunities it had to dispose of the warehouse. Twice in August 1989, SKI was notified by the JV of the obligation to dismantle the warehouse. The Navy required the JV to restore the warehouse site to its previous condition. SKI refused to respond to the JV's letters. As a result, the JV exercised its right to enter a separate contract with Virginia Wrecking Company for that company to dismantle the warehouse and restore the site.

■ In summary, SKI had a property interest in the Sherman Avenue warehouse, but that interest was circumscribed by the contracts. Once the Navy requested the dismantling of the warehouse, compliance was required. SKI refused to request permission to keep the warehouse standing, and SKI refused to dismantle the warehouse after being requested to do so. The evidence in the record establishes that SKI effectively abandoned the warehouse. In these circumstances, there was no taking of a property interest in the category 2 property for which Fifth Amendment compensation would be owed.

### Category 3

■ There is no dispute that plaintiff owned tools and equipment needed for the Project, as well as the materials, tools, equipment, and medical and office supplies needed for other contracts, which were stored in the warehouse on December 13, 1988. Also, the Navy was aware that materials of this type were stored in the warehouse. Specific items, and quantities of those items in category 3 are unknown. SKI had no inventory lists that would show specifically the warehouse contents as of December 1988.

SKI contends, in view of the fact that the materials were not present in May 1989, SKI's property in this category was either sold by the JV to other contractors on the Base, or was given to Virginia Wrecking Company when they acquired possession of the warehouse.

SKI's taking claim for this type of property is based on the argument that, because the Base did not have established formal procedures available to SKI to protect its interests when the Navy opened the warehouse, the Navy's actions made it possible for someone else to obtain the use or benefit of SKI's property. SKI cites *Langenegger v. United States*, 756 F.2d 1565 (Fed.Cir.1985) for this proposition. SKI misapplies the ruling in *Langenegger*. SKI ignores the court's statement that where government action relates causally to private misconduct which leads to property damage, "a determination must be made whether the government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment." 756 F.2d at 1570. SKI ignores the procedures established in the Base Commander's December 9, 1988, order, and in the Navy's December 14, 1988, notice to SKI.

The December 9, 1988, order did not by its terms impose restrictions on SKI's access to the warehouse and its contents. The procedures that the Navy established did not, in fact, give SKI's property in the warehouse to the JV. The procedures made only the JV's property available to the JV. Skip Kirchdorfer testified that he instructed his employees to stay away from the warehouse because he feared they would be thrown off the base. Mr. Kirchdorfer's alleged "fear" is a make-weight argument. The record does not support a conclusion that such a threat was made to SKI's employees. The "fear" is inconsistent with the unambiguous language of the order, all of the correspondence between the parties, Mr. Kirchdorfer's own actions and the actions of his employees, and basic common sense.

SKI was in no way denied access to its materials. The JV opened the warehouse from 7:00 a.m. to 4:30 p.m. The Navy suggested to SKI that any ownership disputes between SKI and the JV could be settled by normal legal process in the United States. SKI refused to cooperate. SKI's actions to abandon the property by nonparticipation in the procedures were completely unreasonable.

SKI's own actions in January 1989 show the extent of the access which SKI had to the warehouse and its contents. SKI removed large quantities of its category 3 materials from the warehouse during the second week of January 1989. The evidence shows that SKI removed whatever it pleased. SKI removed everything of value from the warehouse, and left behind items that were broken, inoperable, or simply not cost efficient to take.

To suggest that Skip Kirchdorfer did not know that his employees removed items from the warehouse after December 13, 1988, is contrary to the evidence. The record shows SKI's project manager was instructed by Mr. Kirchdorfer to sell whatever items he could. The sign-out sheets established, not only that SKI had free and continuous access to the warehouse, but that SKI removed massive amounts of tools, equipment, and materials from the warehouse in January and February of 1989. The evidence simply does not support a conclusion that the Navy was responsible for a taking of SKI's category 3 property.

On the basis of the foregoing, SKI has not established that the Navy's actions in December 1988 and subsequently resulted in a taking for which compensation is owed. The Clerk is directed to dismiss the complaint. Defendant may recover its costs.