**SKIP KIRCHDORFER, INC.,**
**Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–**
**Appellee.**

No. 93–5004.

United States Court of Appeals,
Federal Circuit.

Oct. 12, 1993.

Rehearing Denied Dec. 10, 1993.

Laurence J. Zielke, Pedley, Ross, Zielke & Gordinier, Louisville, KY, argued for plaintiff-appellant. With him on the brief was William H. Mooney.

Mark D. Rubino, Trial Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was Stephanie Cates–Harman, Dept. of the Navy, of counsel.

Before MAYER, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

The United States Court of Federal Claims determined that Skip Kirchdorfer, Inc. (SKI) did not show that the United States Navy took private property for public purposes without just compensation. *Skip Kirchdorfer, Inc. v. United States*, 26 Cl.Ct. 666 (1992). Because the trial court's findings show a Fifth Amendment taking, this court reverses-in-part and remands.

## BACKGROUND

The Navy awarded a contract for the construction of family housing at the Guantanamo Bay Naval Station to the joint venture (JV) of American Export Group, International Services, Inc. (AEGIS) and Zublin Delaware, Inc. (Zublin). SKI was a subcontractor on this family housing contract.

The prime contract called for the provision of 125 units of turnkey family housing at a fixed price of $11,595,000. SKI's subcontract covered the construction of the housing at a fixed price of $4,250,000. Under the subcontract, the JV promised to supply all construction materials, while SKI promised to provide all necessary tools, equipment, and labor.

The JV's contract with the Navy, and SKI's subcontract with the JV, authorized construction of temporary buildings for storage, offices, and shops. The subcontract required SKI to store the JV's construction materials and to provide an office for the JV's representative.

Under these contracts, SKI constructed a warehouse. In the warehouse, SKI stored both the JV's construction material and SKI's own material, tools, and equipment for other contracts at the base. SKI did not maintain itemized inventory lists of property in the warehouse. However, SKI segregated roughly the various types of materials into separate areas within the warehouse.

SKI's subcontract stated that the "temporary buildings and utilities shall remain the property of the Contractor and shall be removed by him at his expense upon the completion of the work." In addition, custom and understanding on the base permitted a contractor to use a warehouse for contracts other than those for which it was specifically approved, and to extend the use of the warehouse as needed for other contracts. According to this understanding, SKI owned and continued to use the warehouse after the SKI–JV contract terminated.

The JV–Navy contract required completion of the housing project by July 23, 1987. The project suffered delays. AEGIS filed Chapter 11 Bankruptcy; Zublin undertook to complete the project alone. Disputes relating to performance under the subcontract erupted between SKI and Zublin. By August 30, 1988, the JV had no personnel in its office at the warehouse. Although the project was near completion, the project still required a substantial amount of work.

In September 1988, because of its ongoing dispute with Zublin, SKI stopped work on the project and asserted control of the warehouse. SKI rented office space in the warehouse to another company, Kelley Co. For the first time, Zublin lacked access to the warehouse.

In September 1988, the Navy notified Zublin of a potential termination for default. As a result, Zublin sought access to the materials in the warehouse. SKI denied Zublin access throughout October and November. In November, Zublin arranged for another contractor, APTCO, to finish the housing units. SKI asked the JV to supply an inventory of its materials in the warehouse. The JV refused, maintaining that SKI was responsible for segregating and inventorying the SKI materials in the warehouse. Neither SKI nor the JV performed an inventory before December 8, 1988.

In early December, representatives of Zublin and SKI met on Guantanamo, but SKI still denied Zublin entry into the warehouse and access to its materials. SKI's president instructed its project manager to allow no one access to the warehouse.

Zublin then sought the assistance of the Navy. The Navy Base Commander issued an order requiring SKI to allow Zublin to enter the warehouse and remove JV property. The Commander ordered Zublin to sign an itemized receipt for any material removed. Under the order, SKI could note any disputes as to ownership of removed property on the receipt. The order contemplated that courts could resolve such ownership disputes later. SKI, refusing to follow the order, denied Zublin access to the warehouse.

On December 12, 1988, base security personnel detained SKI's project manager. Early on December 13, Navy security personnel, Zublin representatives, and others arrived at the warehouse. The Navy personnel forced the warehouse door and cut locks to which only SKI's project manager had a key. Representatives from the Navy, the JV, APTCO, and Kelley Co. gained access to the warehouse facility at that time.

The JV assumed control of the warehouse, opening it daily from 7:00 a.m. to 4:30 p.m. The JV hired an APTCO representative to remain at the warehouse during normal working hours and to monitor the removal of the JV's property and compliance with sign-out procedures. Though the order permitted it, SKI did not monitor the removal process.

Neither the Navy nor JV personnel denied SKI access to the warehouse facility. On December 14, the Navy offered SKI "free, unhampered, unrestricted and continuous access to the warehouse and all [SKI] property therein." During the first four months of 1989, SKI removed substantial amounts of material, tools, and equipment from the warehouse. SKI kept no inventory of the removed property. By the end of this period, all valuable materials, tools, and equipment had been removed.

In August 1989, the Navy told Zublin to remove the warehouse and restore the area to its original condition. Zublin told SKI, as the warehouse owner, to remove the warehouse and restore the site. SKI refused to dismantle the warehouse. In September 1989, Zublin contracted with Virginia Wrecking Company to remove the warehouse and restore the site in exchange for use of the warehouse. The Navy approved this sale. Virginia Wrecking used the warehouse until August 1991, then dismantled it, and took the parts to the dump.

On December 19, 1988, SKI filed a complaint in the District Court for the Eastern District of Virginia including takings claims. The takings claims were eventually transferred to the United States Court of Federal Claims and resulted in the decision now appealed.

## DISCUSSION

■ This court reviews judgments of the Court of Federal Claims "to determine whether they are 'incorrect as a matter of law' or premised on 'clearly erroneous' factual findings." *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1171 (Fed.Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991).

### Origins of the Takings Clause

The Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." The first Congress proposed the Fifth Amendment against a backdrop of growing dissatisfaction with uncompensated Government seizures of private property. Before adoption of the Amendment, uncompensated seizures of private property for public roads and other public projects were common. *Lucas v. South Carolina Coastal Council,* — U.S. —, —, 112 S.Ct. 2886, 2915, 120 L.Ed.2d 798 (1992) (Blackmun, J., dissenting).

Although the colonists did not contest the sovereign's right to appropriate private land for the benefit of the public, the concept of just compensation was not unknown. *See* 1 William Blackstone, *Commentaries on the Laws of England* 138 (George Sharswood, ed., 1880). In colonial Massachusetts and New York, for example, land owners received compensation upon seizure of improved lands to build public roads. Fred Bosselman, David Callies, John Banta, *The Taking Issue* 85 (1973) (Bosselman); William M. Treanor, *The Origins and Original Significance of the Just Compensation Clause of the 5th Amendment,* 94 Yale L.J. 694, 695 & n. 6 (1985). However, land owners often received no compensation for unimproved land. *See* Bosselman, *supra,* at 85.

After the Revolutionary War, state legislatures passed laws seizing loyalist lands, dissolving or devaluing debts, and forestalling debt collection. These appropriations stirred controversy. *See* Treanor, *supra,* at 704. Vermont and Massachusetts became the first states to include in their constitutions a just compensation clause. The Vermont Constitution of 1777, ch. I, art. II provided:

> That private property ought to be subservient to public uses, when necessity requires it; nevertheless, whenever any particular man's property is taken for the use of the public, the owner ought to receive an equivalent in money.

Vt. Const. of 1777, ch. I, art. II, *reprinted in* 9 William F. Swindler, *Sources and Documents of United States Constitutions* 489 (1979). The provision countered New York State's attempt to dispossess Vermont residents of their land. *See id.* at 487.

The Constitution of Massachusetts of 1780 provided:

> Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty, and property, according to standing laws.... And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor.

Mass. Const. of 1780, pt. I, art. X, *reprinted in* 5 William F. Swindler, *Sources and Documents of United States Constitutions* 94 (1975). This clause restrained the legislature's power to seize property or diminish property rights. *See* Treanor, *supra,* at 706.

The Northwest Ordinance of 1787 also included a just compensation clause:

> No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land, and should the public exigencies make it necessary, for the common preservation, to take any person's property, or to demand his particular services, full compensation shall be made for the same.

The Ordinance of 1787: The Northwest Territorial Government, art. II, *reprinted in* 3 Ronald D. Rotunda, John E. Nowak & J. Nelson Young, *Treatise on Constitutional Law* 540, 544 (1986). This national law protected settlers' property rights in new land grants. *See* Treanor, *supra,* at 707.

Leading constitutional theorists of the fledgling Republic viewed property rights as an important aspect of personal liberties. For instance, James Madison, author of the Bill of Rights, recognized property rights as fundamental to liberty. Madison wrote:

Government is instituted no less for protection of the property than of the persons of individuals. The one as well as the other, therefore, may be considered as represented by those who are charged with the government.

*The Federalist No. 54,* at 339 (James Madison) (Clinton Rossiter ed., 1961). Based on this concept of liberty, Madison's proposed draft of the Fifth Amendment provided:

No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offense; nor shall be compelled to be a witness against himself; nor be deprived of life, liberty, or property without due process of law; *nor be obliged to relinquish his property, where it may be necessary for public use, without a just compensation.*

James Madison, Speech Proposing Bill of Rights (June 8, 1789), *in* 1 *Annals of Congress* 434 (Joseph Gales ed., 1834) (emphasis added). This proposed Takings Clause would have applied only to direct, physical takings by the Federal Government. *See Lucas,* —— U.S. at —— n. 23, 112 S.Ct. at 2915 n. 23 (Blackmun, J., dissenting); Treanor, *supra,* at 708.

Madison's proposed language for the just compensation clause changed during consideration in the First Congress. The changes made the language clearly broader than Madison's proposed version. The Fifth Amendment embraces direct physical takings as well as other types of Government authorized intrusions.

Judicial Treatment of Physical Occupations

In accord with the historical origins of the Takings Clause, the Supreme Court initially construed takings to be primarily direct, physical encroachments on private property. *See* Bosselman, *supra,* at 106. In *Pumpelly v. Green Bay Co.,* 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872), a state statute authorized defendant's construction of a flood-control dam. The dam permanently flooded the plaintiff's property. The Court held that the permanent physical invasion of water was a taking requiring compensation. *See also United States v. Lynah,* 188 U.S. 445, 470, 23

S.Ct. 349, 357, 47 L.Ed. 539 (1903), *overruled-in-part by United States v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.* 312 U.S. 592, 598, 61 S.Ct. 772, 776, 85 L.Ed. 1064 (1941); *cf. Bedford v. United States,* 192 U.S. 217, 225, 24 S.Ct. 238, 240, 48 L.Ed. 414 (1904).

Similarly, in *St. Louis v. Western Union Telegraph Co.,* 148 U.S. 92, 13 S.Ct. 485, 37 L.Ed. 380 (1893), the Western Union Telegraph Company placed its poles on city streets. The city of St. Louis sought payment for the use of its streets for the poles. The company, contesting its duty to pay, relied in part on a federal statute authorizing this use of post roads. The Court characterized the installation of poles as "an absolute, permanent and exclusive appropriation of that space in the streets." *Id.* at 99, 13 S.Ct. at 488. Accordingly, the Court ordered compensation.

The Court reaffirmed the significance of a physical occupation in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Loretto,* a state statute required landlords to allow installation of cable TV companies' cables and equipment on their rental properties. The statute prohibited the landlords from charging the cable companies or their tenants for the installation rights. Jean Loretto, owner of an apartment building on which a cable had been installed, sought just compensation. The Court agreed:

[W]hen the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, "the character of the government action" not only is an important factor in resolving whether the action works a taking but also is determinative.

*Id.* at 426, 102 S.Ct. at 3171.

The Court also emphasized the severity of permanent physical occupations:

Property rights in a physical thing have been described as the rights "to possess, use and dispose of it." *United States v. General Motors Corp.,* 323 U.S. 373, 378 (1945). To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights.

*Loretto,* 458 U.S. at 435, 102 S.Ct. at 3176. The Court identified the right to exclude others and the right to control the use of property as fundamental property rights. Permanent physical occupation, stated the Court, destroys those rights. *Id.* at 435–36, 102 S.Ct. at 3175–76. "To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury." *Id.* at 436, 102 S.Ct. at 3176.

Takings Clause Analysis

*Private property*

■ A taking compensable under the Fifth Amendment inherently requires the existence of "private property." As part of a takings case, the plaintiff must show a legally-cognizable property interest. Not all losses generate a Fifth Amendment taking. *See United States ex rel. Tennessee Valley Auth. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 1055, 87 L.Ed. 1390 (1943).

SKI alleges the taking of three types of private property: (1) SKI's lien interests in the JV's materials in the warehouse; (2) SKI's own materials; and (3) SKI's temporary warehouse itself. The Court of Federal Claims held that SKI had no property interest protected by the Fifth Amendment.

*Lien interests in the JV materials*

■ Under the subcontract, the JV stored its construction materials for the Turnkey Housing Project in the temporary warehouse controlled by SKI. When both SKI and the JV invoked their rights to terminate the subcontract, SKI contends that it acquired a lien interest in the JV's materials to satisfy its outstanding claims against the JV.

■ Valid liens under state law may generate property interests within the scope of

the Fifth Amendment. *See Armstrong v. United States,* 364 U.S. 40, 46, 80 S.Ct. 1563, 1567, 4 L.Ed.2d 1554 (1960). To constitute a compensable property interest, however, the purported lien must rise to a legally cognizable interest. *Id.* at 48, 80 S.Ct. at 1569.

■ The Court of Federal Claims noted that there are "no provisions for recording or perfecting liens on Guantanamo Bay, Cuba." *Skip Kirchdorfer,* 26 Cl.Ct. at 675. Thus, SKI had no lien under state or territorial law. Moreover, SKI had no common law mechanics' lien. A mechanics' lien arises when the lienholder retains possession of another's property after improving the property. The lien acts as security for payment of the services rendered or improvements made with respect to the retained property. 51 Am.Jur.2d, Liens § 20 (1970). Here, SKI merely stored the JV materials, and made no improvements. Moreover, because unable to attach mechanics' liens to Government property, subcontractors receive protection under the Miller Act.[1] This protection supplants a mechanics' lien against improved property. *F.D. Rich Co. v. United States,* 417 U.S. 116, 121–22, 94 S.Ct. 2157, 2161–62, 40 L.Ed.2d 703 (1974). SKI points to no source of law creating a common law mechanics lien.

■ SKI also asserts a "possessory equitable lien" or a "common law lien" on the JV materials in SKI's warehouse. A common law lien is a right to retain possession of another's goods until the property owner satisfies a demand that the lien-holder has a right to assert against the property owner. 51 Am.Jur.2d, Liens § 20. It may arise from established custom and usage of a particular trade or from a mode of dealing between the parties. *Id.* The Fifth Amendment protects

---

**1.** The Miller Act, in pertinent part, provides:

Before any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":

(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall

deem adequate, for the protection of the United States.

(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.

40 U.S.C. § 270a (1988). The Miller Act provides protection for subcontractors providing labor or materials to a contractor working under a government contract. *F.D. Rich Co. v. United States,* 417 U.S. 116, 121–22, 94 S.Ct. 2157, 2161–62, 40 L.Ed.2d 703 (1974).

property interests consisting of recognized expectations, *Kaiser Aetna v. United States,* 444 U.S. 164, 179, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979) and mutual understandings. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), *overruled on other grounds by Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Such expectations and understandings generally arise under state law, but may also spring from custom and practice. *United States v. Arredondo,* 31 U.S. (6 Pet.) 691, 714, 8 L.Ed. 547 (1832).

SKI alleges that custom and practice at Guantanamo Bay honored possessory lien claims. The record, however, does not show any custom or practice of recognizing subcontractor liens on the naval base. During trial, SKI presented a witness who testified about a single time that the Navy honored a materialmen's lien. This scant evidence of one isolated incident, however, rebuts rather than establishes a custom of honoring a common law lien interest.

■ SKI similarly did not show an equitable lien on the JV materials. An equitable lien has three requirements: an obligation of the property owner to the lien holder, a res—identifiable with reasonable certainty—to which that obligation fastens, and an intent that the res secure performance of the underlying obligation. 51 Am.Jur.2d, Liens § 24 (1970). SKI has not shown the fact or amount of any obligation owed by the JV. The Court of Federal Claims found:

> SKI's asserted right to retain possession was based on an inchoate claim against the JV, which was still to be determined in arbitration proceedings.

In addition, the trial court found that SKI did not specifically identify the JV materials purportedly subject to the lien. Finally, SKI supplies no evidence of an intent that the JV materials would secure any JV obligations. SKI had no equitable lien in the JV materials.

■ Even if SKI had an enforceable lien on the JV materials, the United States had a superior claim by virtue of the title vesting clauses contained in the subcontractor contract. General Provision 7(d) of the SKI–JV contract provided that "[a]ll material and work covered by progress payments made shall thereupon become the sole property of the Government." This title vesting clause established a security interest in favor of the Government in materials and equipment covered by the progress payments. *See Marine Midland Bank v. United States,* 687 F.2d 395, 403, 231 Ct.Cl. 496 (1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983). This Government interest is superior to any inchoate lien SKI may have had. *Id.* at 404. Without proof that its interest trumped the Government's superior lien interest, SKI, for this reason as well, had no compensable lien interest in the JV's materials.

### SKI's tools, equipment, and materials in the warehouse

■ SKI stored its own tools, equipment, and materials in the warehouse. SKI had an undisputed interest in this property. However, the Commander's order did not deny SKI access to its own property in the warehouse. SKI has not provided documentation of any specific property seized by the Government or the JV. In sum, SKI has not shown that any property interest in its tools, equipment, and materials in the warehouse was taken under the Fifth Amendment.

### The warehouse

■ SKI constructed the warehouse at its own expense under its contract with the JV. The Navy approved SKI's construction of the warehouse under the housing contracts. The SKI–JV contract made this temporary building "the property of the [sub]Contractor ... [to] be removed by him at his expense upon completion of the work." In addition, the Navy routinely allowed contractors to use a warehouse for contracts other than those for which it was specifically approved. The Navy also routinely extended the use of a warehouse for other contracts. SKI relied upon this custom in storing tools, equipment, and materials for other contracts in the warehouse.

The Court of Federal Claims found that SKI had a property interest in the warehouse:

It is clear that SKI had a property interest in the components of the temporary structure. Also, SKI controlled access to the building and compound, decided on hours of operation, could sell or relocate the building, or even dismantle and ship it away from Guantanamo. Further, as long as SKI had ongoing contracts, under the local practice, it could continue to use the warehouse, subject to approval by the Navy, after completion of the contract for which approval was given initially.

*Skip Kirchdorfer*, 26 Cl.Ct. at 676. The trial court, however, held that this property interest was not compensable under the Fifth Amendment.

To the contrary, SKI clearly had fundamental property interests in the warehouse. SKI retained the right to dispose of the warehouse upon completion of the Turnkey Housing Project. The trial court specifically found that SKI "could sell or relocate the building, or even dismantle and ship it away from Guantanamo." The right to dispose of the warehouse (including its components) is a property interest protected under the Fifth Amendment. *See United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945) (holding that the Fifth Amendment protects rights to possess, use and dispose of physical property).

SKI also possessed the rights to control the use of the warehouse and to exclude others from its property. SKI's right to exclude others derives from its contract with the JV, which vested ownership of the warehouse in SKI. The Navy's custom to allow contractors to retain the warehouse during and beyond the term of the project buttressed SKI's property rights. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979) ("While the consent of individual officials representing the United States cannot 'estop' the United States it can lead to the fruition of a number of expectancies embodied in the concept of 'property'—expectancies that, if sufficiently important, the Government must condemn and pay for before it takes over the management of the landowner's property." (citation omitted)). Thus SKI had property

interests in its warehouse within the protection of the Fifth Amendment.

*Taking*

To recover under the Takings Clause, a claimant with a recognized property interest must show that its interest was "taken." *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). When the Government authorizes a permanent physical occupation, the Supreme Court has recognized a per se taking. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, 102 S.Ct. 3164, 3175–76, 73 L.Ed.2d 868 (1982). Thus, permanent physical occupation causes a taking regardless of the economic impact on the owner or the magnitude of public interests. *Id.*

A "permanent" physical occupation does not necessarily mean a taking unlimited in duration. *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed.Cir.1991). A "permanent" taking can have a limited term. *Id.* In *Hendler*, this court concluded that the distinction between "permanent" and "temporary" takings refers to the nature of the intrusion, not its temporal duration. *Id.* at 1377. A "permanent" physical occupation, as distinguished from a mere temporary trespass, involves a substantial physical interference with property rights. *See id.*

The Court of Federal Claims found that the Navy seized SKI's warehouse on December 13, 1988. This physical invasion— complete with broken locks at early morning hours—falls within the rule of *Loretto*. Breaking and entering constitutes a substantial physical intrusion on SKI's property. *See Kaiser Aetna*, 444 U.S. at 180, 100 S.Ct. at 393; *Hendler*, 952 F.2d at 1375. Before December 13, 1988, SKI controlled access to its facility; after the Navy forced the doors, SKI no longer controlled access. The Navy took SKI's property.

The JV did not continuously occupy the warehouse. Nevertheless, a permanent physical occupation need not be continuous and uninterrupted. *Hendler*, 952 F.2d at 1377. An intermittent intrusion still causes a taking. *See Kaiser Aetna*, 444 U.S. at 180, 100 S.Ct. at 393 (holding that a compensable

taking exists where the Government physically invades an easement in property, allowing third parties to have intermittent access to claimants' property interests).

■ SKI's retention of some access rights similarly does not preclude a per se taking. As the Supreme Court said in *Loretto,* permanent physical occupations are takings "even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." 458 U.S. at 430, 102 S.Ct. at 3173. Despite SKI's retention of some access rights, the Navy took SKI's property and gave access to a third party.

■ The limited duration of this taking is relevant to the issue of what compensation is just, and not to the issue of whether a taking has occurred. *Hendler,* 952 F.2d at 1376. The Navy gained entry to the warehouse on December 13, 1988. From then on, the JV controlled access to the warehouse. In August 1989, the Navy asked the JV to dismantle the warehouse. The JV informed SKI that, as owner, it was responsible for removing the warehouse. SKI took no action. On September 27, 1989, Zublin sold the warehouse to Virginia Wrecking Company. The wrecking company disposed of the warehouse.

■ The Court of Federal Claims found that this evidence showed that SKI abandoned the warehouse. The trial court concluded that this abandonment foreclosed any Fifth Amendment property interest. The issue of abandonment of the warehouse, however, is relevant only to the question of the duration of the Government-authorized physical intrusion. SKI deserves just compensation for the entire duration of the taking. *See Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949) (just compensation awarded for the entire term the Government seized a private laundry business); *United States v. General Motors Corp.,* 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945) ("the compensation to be paid is the value of the interest taken"); *Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638, 642 (Fed.Cir.1987) (just compensation for a temporary taking based

on the term of the taking). The taking began with the forced entry and ended with abandonment. The Court of Federal Claims did not determine the date of SKI's abandonment. Therefore, we remand this case to determine the date of abandonment and the value of SKI's taken property interest.

*Public purpose*

The Fifth Amendment requires just compensation when private property is taken for a public use. The Navy judge advocate general justified the entry into the warehouse as necessary to maintain order on the overseas military base. The entry was to mitigate the adverse effects on the base of the contract dispute between SKI and the JV. This falls within the scope of "public purpose" under the Fifth Amendment.

### Conclusion

In sum, the Navy did not take within the meaning of the Fifth Amendment any SKI interest in property inside the warehouse. The judgment of the Court of Federal Claims with respect thereto is thus affirmed. But the Navy's breaking and entering without permission constitutes a taking of the warehouse requiring compensation under the Fifth Amendment. The judgment of the Court of Federal Claims with respect thereto is thus reversed and the case is remanded for the determination of just compensation.

### Costs

Each party to bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*

LOURIE, Circuit Judge, concurring-in-part and dissenting-in-part.

I concur in the majority opinion and its conclusions except that I believe that the government's activities with respect to the warehouse did not constitute a Fifth Amendment "taking" requiring compensation.

The warehouse was a temporary building, constructed on government property, required by contract to be removed at the completion of the intended work. The government's activities in breaking into the

warehouse and turning control of it over to the joint venture arose from a dispute between SKI, a subcontractor, and the JV, its prime contractor, because of which SKI denied the JV access to the warehouse. After this action, SKI was still allowed access to the warehouse. When the Navy and the contractor told SKI to remove the warehouse and restore the site to its previous condition, as required by contract, SKI twice refused. The warehouse was then dismantled at the behest of the contractor.

I do not believe these circumstances constituted a "taking" of SKI's property. SKI and its contractor were bound by terms of a contract, as were the Navy and the contractor. It was the contract that governed SKI's use of the warehouse. SKI's recourse should have been an action for breach of contract, if anything. Pursuant to the terms of the contract, SKI could not reasonably have expected to maintain the warehouse after completion of the contract. All it had was a future right to the structural materials when the warehouse was dismantled, which right SKI abandoned when it refused to remove the warehouse, as the trial court held. Thus, there was no taking.

I would affirm.