**SKIP KIRCHDORFER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 337–89C.**

United States Court of Federal Claims.

June 18, 1996.

Charles F. Merz, Louisville, Kentucky, attorney of record, for plaintiff.

Stephanie M. Jackson, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, attorney of record, for defendant.

## MEMORANDUM OF DECISION

HARKINS, Senior Judge.

This case is before the court on the request of Skip Kirchdorfer, Inc. (SKI) for attorney fees and other expenses, filed October 30, 1995,[1] pursuant to the Equal Access to Justice Act (EAJA) (28 U.S.C. § 2412(d) (1994)).

■ The EAJA provides that a prevailing party other than the United States may recover an award for attorney fees and other expenses, in addition to costs incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (1994). Eligibility for attorney fees requires (1) that the claimant prevailed in the action, (2) that the Government's position was not substantially justified, (3) that the award of attorney fees is not unjust, and (4) that the fee application is timely filed and supported by an itemized statement. *Comm'r Immigration & Naturalization Serv. v. Jean*, 496 U.S. 154, 158, 110 S.Ct. 2316, 2319, 110 L.Ed.2d 134 (1990).

In this case, criteria No. 2 and No. 3 preclude an award. The position of the United States was "substantially justified" and special circumstances make an award of attorney fees unjust.

Determination of plaintiff's taking claims has been protracted. Judicial proceedings on plaintiff's claims against the United States began on December 19, 1988, in the District Court for the Eastern District of Virginia, on a complaint that alleged a wrongful taking without due process of law, conversion, false imprisonment, and tortious interference with contract rights. By order dated March 31, 1989, the district court dismissed the tort claims, and ordered the taking claims to be transferred. The taking claims were transferred to this court on June 15, 1989, and the complaint was filed on July 17, 1989.

After trial, the complaint was ordered dismissed, on August 18, 1992, on the ground that SKI had not established a taking for which compensation was owed. *Kirchdorfer v. United States*, 26 Cl.Ct. 666 (1992). On appeal, the Federal Circuit on October 12, 1993, affirmed-in-part, reversed-in-part, and remanded for further proceedings to determine the value of SKI's taken property interest. *Kirchdorfer v. United States*, 6 F.3d 1573 (1993).

On July 5, 1994, by order, unpublished, the value of SKI's taken property was determined and judgment was ordered in the amount of $24,062.50, plus simple interest on that amount calculated from December 13, 1988, to the date of payment at rates determined under the method provided in 41 U.S.C. § 611. Judgment was entered July 12, 1994. The Federal Circuit affirmed on May 12, 1995. Table; 56 F.3d 82. The Supreme Court denied certiorari on October 2, 1995. —— U.S. ——, 116 S.Ct. 191, 133 L.Ed.2d 127 (1995).

The status of SKI's operations at the Guantanamo Bay Naval Station on December 13, 1988, provides perspective on its eligibility for attorney fees and expenses. SKI was a small business operation engaged in contracting at Guantanamo Bay, Cuba, either as a prime contractor or as a subcontractor on Navy construction contracts.

The taking claims originate from a subcontract (JV–SKI) entered on June 17, 1986, for work on a "turn key" contract for design and construction of 125 units of family housing (the Project). A joint venture (JV or AEGIS–Zublin) held the prime contract (JV–

---

**1.** Documents related to plaintiff's application were received by the Clerk on Oct. 30, 1995. Defects, including status of attorney of record, compliance with RCFC 82(c) and 83, and Appendix E (AO 191 Form), were not clarified until Nov. 16, 1995, on which date the application was filed *nunc pro tunc*.

NAVY). The prime contract was a firm fixed-price construction contract in the amount of $11,595,000 entered on November 25, 1985. SKI's subcontract covered the construction work at a fixed price of $4,250,000.

In its work as construction subcontractor, SKI obtained approval from the JV and the Navy to locate a temporary building on Sherman Avenue for office space and warehouse/shop operations. The total cost of materials used to construct the temporary warehouse facility was $63,105. Progress payments for mobilization costs included $150,000 paid to SKI for the office and warehouse/shop facility on Sherman Avenue.

The prime contract provided that work would start on November 30, 1985, and the project was to be completed by July 23, 1987. During the period 1986–88, the Project was delayed and substantial changes occurred in the relationships of the parties. One member of the JV filed under Chapter 11 of the Bankruptcy Code, and the other member (Zublin) took over completion of the Project. Disputes between SKI and Zublin culminated on November 5, 1987, in the start of arbitration proceedings on SKI's claims for delays, nonpayment, and extended overhead.

Beneficial occupancy was given as to all housing units by August 21, 1988. As of August 30, 1988, most of the Project construction work had been completed, and occupancy by Navy personnel of the residential units was in progress. As of that date, a substantial amount of work remained outstanding. Numerous punch list items needed completion, and workmanship deficiencies directly attributable to SKI's performance, and for which SKI was responsible, were substantial. Workmanship deficiencies included: improper welding, improper plumbing connections, failure to connect bathtub overflow drains, defective duct work, use of defective materials, and use of rejected materials.

In September 1988, SKI repudiated work on the Project. SKI performed no work on the Project after September 15, 1988. Prior to December 1988, the subcontract had been terminated by mutual agreement.

As of September 30, 1988, the JV had paid SKI $4,073,058 for subcontract work. The balance owed was $16,963. As of September 30, 1988, SKI had submitted to the JV claims for delays, nonpayment, and extended overhead, that totaled $940,000.

After August 1988, the business of SKI was in the process of winding down. SKI's only contracts were at Guantanamo Bay and there were only a few contracts at that facility that required completion. On November 30, 1986, SKI's income statement listed nine completed contracts and six contracts in progress. As of May 31, 1988, SKI's income statement listed four completed contracts and three contracts in progress. As of November 30, 1986, SKI had retained earnings of $2,084,748; on November 30, 1987, retained earnings were $3,021,047; on May 31, 1988, retained earnings were $1,675,866. SKI's president represents that SKI performed no further work and conducted no other business after December 1988 beyond liquidation of its assets and completion of its contracts at Guantanamo Bay.

SKI's labor force at Guantanamo Bay during the contract years approached a maximum of 250 to 300 workers. By December 1988, the labor force had been reduced to 15–20 workers.

On December 13, 1988, numerous items in the Project needed completion, and workmanship deficiencies directly attributable to SKI's performance, and for which SKI was responsible, were substantial. Final completion of all warranty and punch list work was in August 1989. Termination of the subcontract prior to December 1988 permitted SKI to avoid expenses involved in the warranty work. SKI also had an interest in avoiding the liability and costs involved in removing and dismantling the office and warehouse/shop facility. Under the subcontract, SKI had the obligation to remove the facility at its own expense.

On December 13, 1988, arbitration proceedings on SKI's $940,000 claims had been underway since November 5, 1987. Access to the Sherman Avenue facility was an item SKI used to bargain with Zublin and the Navy resident officer in charge of construction (ROICC).

*Prevailing Party*

■ SKI was a "prevailing party" under current EAJA precedent. Prevailing party status is a statutory hurdle. The prevailing party requirement is a generous formulation that brings a plaintiff only across the statutory threshold. *Comm'r Immigration & Naturalization Serv.*, 496 U.S. at 160, 110 S.Ct. at 2320. A typical formulation is that "plaintiffs may be considered prevailing parties for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The court is to look at whether the plaintiff has substantially prevailed in the litigation, not merely whether they won on the disposition of the matter. *A. Hirsh, Inc. v. United States*, 948 F.2d 1240, 1244 (Fed.Cir.1991). Plaintiff prevailed as to a portion of the private properties on which its taking claims were based.

Plaintiff meets the small business criteria of 28 U.S.C. § 2412(d)(2)(B).

*Procedural Criteria*

The EAJA application was timely filed. The judgment entered July 12, 1994, became a final judgment on October 2, 1995, when the petition for writ of certiorari was denied by the Supreme Court. The application was filed on October 30, 1995, within 30 days of final judgment. 28 U.S.C. § 2412(d)(2)(G).

The application is adequate to satisfy the statutory requirements for an itemized statement and the implementing provisions specified in the court's rules. 28 U.S.C. § 2412(d)(1)(B), RCFC 81(e) and Appendix E. Plaintiff's application includes itemized statements of actual time expended and the itemized rates at which attorney fees and expenses were calculated. Some of the items listed as expenses may be questionable, and there is confusion in the amount sought: Form AO 291 dated November 9, 1995, listed total fees and expenses of $168,599.92; the October 30, 1995, calculation listed total fees and expenses of $138,930.92; and the January 23, 1996, supplement listed changes that raised the total to $144,080.86. Inasmuch as the EAJA application is denied for other reasons, it is not necessary to resolve these and other discrepancies in the itemization.

*Substantially Justified*

■ The meaning of the phrase "substantially justified" has been a continuing source of litigation since enactment of the EAJA in 1980. *See Spencer v. N.L.R.B.*, 712 F.2d 539 (D.C.Cir.1983); *Enerhaul v. N.L.R.B.*, 710 F.2d 748 (11th Cir.1983); *Gava v. United States*, 699 F.2d 1367 (Fed.Cir. 1983); *Broad Avenue Laundry & Tailoring v. United States*, 693 F.2d 1387 (Fed.Cir. 1982). In 1988, the Supreme Court clarified the differing concepts and defined a standard that equates with the formulation "reasonable basis both in law and fact." A position is "substantially justified" if it is "justified in substance or in the main—that is justified to a degree that would satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). A loss on the merits is not equated with a lack of substantial justification under the EAJA. The Government "could take a position that is substantially justified, yet lose." *Pierce*, 487 U.S. at 569, 108 S.Ct. at 2552. When a party has prevailed in litigation against the Government, the Government bears the burden of proving that its position was substantially justified. *Gavette v. OPM*, 808 F.2d 1456, 1465–66 (Fed.Cir. 1986) (en banc).

■ A trial court's decision to award attorney fees under the EAJA is discretionary. To determine whether the position of the United States is substantially justified, trial courts are instructed to look at the entirety of the Government's conduct and "make a judgment call whether the government's overall position had a reasonable basis both in law and fact." *Chiu v. United States*, 948 F.2d 711, 715 (Fed.Cir.1991).

SKI's taking claims involved three categories of property: (1) materials procured by the JV and furnished to SKI for storage and use in the Project on which SKI alleged a common law possessory lien or an equitable lien on construction materials, (2) SKI's materials, tools and equipment used for work on the Project, as well as SKI's materials, tools and equipment applicable to SKI's other work on the Naval Base, and (3) the Sher-

man Avenue warehouse facility itself and the permission to its use.

SKI did not attribute a specific value to each of the categories of property. This is partially due to an absence of records. SKI did not keep an inventory and had no idea what was contained in the Sherman Avenue warehouse. The value SKI used to cover all categories of property, however, varied substantially during the course of this litigation.

SKI on December 19, 1988, in its complaint in the District Court alleged that the value of all properties seized and turned over to the JV amounted to approximately $5,500,000. This value was repeated in the complaint filed in this court on July 17, 1989. In the Appendix G materials filed on August 26, 1991, the value of all property alleged to be taken was $1 million. At trial, January 6–15, 1992, the claim was reduced to $951,821. On appeal, the Federal Circuit affirmed that category 1 and category 2 property interests had not been taken, reversed as to category 3 property, and remanded to determine the date SKI had abandoned the Sherman Avenue warehouse and the value of SKI's taken property interest. On remand, SKI contended the fair rental value of the taken property was $480,000, which, with interest at an 8 percent rate, totaled $807,032. The final and total value of SKI's taken category 3 property, as stated in the judgment entered July 12, 1994, was $24,062.50, plus simple interest on that amount.

SKI had no private compensable interests in category 1 property. SKI had no lien under state or territorial law, and there was no basis for a common law mechanics lien. SKI did not show any custom or practice of recognizing subcontractor liens on the Naval Base, and did not show any equitable lien on JV materials in the warehouse. Further, the title vesting clause in the SKI–JV contract for materials covered by progress payments established a security interest in the Government superior to any inchoate lien SKI may have had.

None of the property in category 2 was taken. On the taking date, SKI had in the warehouse tools and materials that were related to other contracts as well as SKI's own tools and supplies related to the Project.

The record does not show that any property interest in Ski's tools, equipment and materials in the Sherman Avenue warehouse was taken. SKI's own actions in January 1989 show the extent of the access which SKI had to the warehouse and its contents. SKI removed large quantities of its category 2 materials from the warehouse during the second week of January 1989. The evidence shows that SKI removed whatever it pleased. SKI removed everything of value from the warehouse, and left behind items that were broken, inoperable, or simply not cost efficient to take. After the taking date, SKI used facilities at the Old Corral for storage of tools and materials that it maintained for work outside the scope of its subcontract for the Project. SKI's materials, tools and supplies that were removed from the Sherman Avenue warehouse, unless they were shipped back to the United States, after removal also were stored at the Old Corral.

Plaintiff views this litigation as divisible into two phases: (1) the initial phase that includes the trial and the first appeal to the Federal Circuit, and (2) proceedings on remand, the second appeal to the Federal Circuit, and the petition for certiorari to the Supreme Court. Plaintiff argues that, for defendant's litigation position to be substantially justified, defendant should have conceded in the first phase that the Navy's actions constituted a taking, and that, by denying all culpability defendant maintained a position directly opposite to fact and law which was not substantially justified. Plaintiff argues that given the existence of well established, long standing controlling law, the Government's actions constituted a taking per se and the Government's denial of a Fifth Amendment violation was patently unreasonable in fact and law.

Plaintiff fails to take into account the variety of property claims it pursued in this litigation, only one of which ultimately was found to be eligible for compensation under the Fifth Amendment. The fact that the Government lost as to one category of property does not show that its position in defending the case was not substantially justified. The decision on an award of attorney fees is a judgment independent of the result

on the merits. When the entire action is looked at as a whole, defendant's position was substantially justified and reasonable in both fact and law.

This case was centered around a dispute under the JV–SKI subcontract that escalated to a point where government contract officials became involved directly. On December 13, 1988, it was not at all clear that the Navy's intercession on behalf of the prime contractor in order to make available construction materials owned by the JV and in which the Government had a security interest, would qualify as a compensable taking. This uncertainty is further intensified by the circumstance that access was denied by SKI in order to obtain leverage in bargaining on a $940,000 claim against the JV.

Plaintiff's fundamental property interest in the warehouse as a whole was circumscribed by the nature of its location and the contractual rights and obligations relative to its existence. The right to dispose of the warehouse could not be exercised until completion of the Project. The right to control use of the warehouse was subordinate to contract provisions requiring storage of Project materials and offices for the JV. SKI's right to exclude was limited to security maintenance, and to exclusion of strangers to the prime contract and the subcontract. Under the contracts, SKI could not exclude representatives of the JV from access to Project materials stored in the warehouse. Termination of the subcontract did not destroy these rights. The right to sell, or to move, the warehouse was subject to the approval by the Navy. The expectancy—that was a fundamental property interest which arose from the custom and practice at Guantanamo Bay to allow contractors to continue to use the warehouse after completion of the Project— required the approval of the Navy or acquiescence by the Navy.

Examination of the entire record in this case, makes it clear that most of SKI's taking claims were rejected. Plaintiff was wrong as to categories 1 and 2, and prevailed only on a small portion of the property in category 3. The issue of whether there was a taking of any interest in the Sherman Avenue warehouse was in doubt until clarified by the Federal Circuit. Plaintiff's taking claims were not justified in substance or in the main.

*Special Circumstances*

■ An award of attorney fees and expenses to a prevailing party may be denied if the court finds "special circumstances make an award unjust." The EAJA does not establish criteria to determine what special circumstances would make an award unjust. Conduct which unduly and unreasonably protracted the final resolution of the matter in controversy allows an award to be reduced or denied (28 U.S.C. § 2412(d)(1)(C)); and, although the position of the United States includes the agency action on which the civil action is based, the EAJA does not permit an award for any portion of the litigation in which the party has unreasonably protracted the proceedings (28 U.S.C. § 2412(d)(2)(D)). This case has been in litigation since December 19, 1988. Both parties are responsible for the protracted amounts of time required for determination of SKI's taking claims. Other special circumstances, however, make an award for attorney fees and expenses unjust.

SKI's subcontract covered the construction portion of the Project at a fixed-price of $4,250,000. By August 21, 1988, beneficial occupancy was given and the work approached completion. By September 30, 1988, the JV had paid $4,073,058 for subcontract work and owed a balance of $16,963. At all times thereafter, SKI's efforts centered upon securing additional payments for activities at Guantanamo Bay. These efforts were based, as opportunities developed, variously on claims for delays, nonpayment, and extended overhead, or on taking allegations. The additional payments sought amounted to $940,000 in the November 1987, arbitration proceedings, $951,821 at the trial in January 1992, and $807,032.80 in January 1994. These efforts amounted to a misuse for bargaining purposes of the leverage obtained through litigation tactics.

SKI alleged the Government had taken its category 2 property. In fact, SKI in January 1989, removed all of tools materials and equipment it wanted to take from the Sherman Avenue warehouse and either shipped

them back to the United States or stored them at the Old Corral.

Under its subcontract, SKI was paid in full for its capital investment in the Sherman Avenue warehouse. During mobilization SKI purchased, at a total cost of $63,105, and had shipped to Cuba materials for a 120 foot by 300 foot building to be used as the office and warehouse/shop facility. SKI received progress payments in mobilization of $150,-000 for this facility. By repudiation of obligations under the subcontract, SKI avoided the liability and costs involved in dismantling or removing the Sherman Avenue warehouse.

## CONCLUSION

On the basis of the entire record in this litigation, the position of the United States was substantially justified and special circumstances make an award of attorney fees and expenses unjust under the EAJA. SKI's application is denied.